Order Form Rev 06/2012)

# United State District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Judge James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 09 C 136 | **DATE** | August 9, 2012 |
| **CASE TITLE** | | GREDE v. FC STONE, LLC. | |

**DOCKET ENTRY TEXT:**
Because Count V does not contravene the terms of the Plan or the Stipulation, res judicata is no bar to that count. The motion to dismiss Count V of the Second Amended Complaint [102] is DENIED.

**STATEMENT**

**BACKGROUND**
*Allegations in Second Amended Complaint*

Plaintiff Frederick J. Grede ("Plaintiff" or "the Trustee:") is the trustee for the liquidation trust of the former Sentinel Management Group, Inc. In a Second Amended Complaint ("SAC"), the Trustee brings an adversary proceeding against Defendant FC Stone, LLC ("FC Stone"). FC Stone is a CFTC-registered futures commission merchant ("FCM") and was formerly a customer of Sentinel.

The Trustee alleges that FC Stone had certain funds and other property invested in Sentinel, which funds Sentinel purported to hold in segregated client custodial accounts maintained by the Bank of New York ("BONY"). The segregation (which broke the assets up into pools called SEG 1, SEG 2, and SEG 3) was allegedly mandated by the federal regulatory regime codified in the Commodities Exchange Act and CFTC regulations. The segregation was also allegedly mandated by the contracts Sentinel entered into with its customers. Trustee alleges that in reality Sentinel, aided and abetted by BONY, violated federal law and breached the private agreements by not meaningfully segregating these assets. Instead, says the Trustee, Sentinel created the "false appearance of segregation" but in reality "engaged in a massive scheme to commingle and misuse customer assets of all customer SEGs as if they were part of a single undifferentiated pool of assets, which also included Sentinel's own funds."

The purpose of the commingling, according to the SAC, was to use the commingled assets as collateral for a loan facility issued by BONY. Sentinel allegedly used the loan facility to finance an aggressive securities transaction program, called repurchase agreements, or "repos." This loan facility grew "dramatically over time, rising from $55 million at the end of 2003 to over $253 million at the beginning of May 2007." Customers' supposedly segregated assets were, in reality, being moved around arbitrarily as needed to keep this growing obligation collateralized.

The Trustee claims that the scheme expanded from 2003-2007, but came to a halt in the spring and summer of 2007 with the tightening of the broader credit market. By May of 2007, Sentinel allegedly had over $2.4 billion in outstanding obligations to the repo counterparties, which counterparties began to increase margin requirements or outright refuse to continue financing the securities repo transactions. This

process led to rapid escalation in the BONY loan amount and thus to further movement of segregated funds into an account bolstering the BONY loan.

As of the start of the business day on July 30, 2007, Sentinel was reporting that the SEG 1 account (which is where FC Stone's assets were supposed to have been held) had more than $655 million in total customer balances. In reality, roughly $85 million was in that account. Thus, according to the Trustee, on July 30 approximately 85% of the funds said to be segregated on behalf of FCMs were in reality unsegregated and being used to prop up the BONY loan.

This circumstance took a turn by the end of July 30th. Sometime on that day, Sentinel's CFO allegedly determined that it was time to return SEG 1 assets to their proper segregated account. So over the course of two days, July 30th and 31st, Sentinel allegedly moved over $500 million worth of securities out of the account collateralizing the BONY loan and back into the SEG 1 accounts. To fill the resulting shortfall, however, Sentinel allegedly "looted" the SEG 3 accounts to serve as the collateral in place of the SEG 1 assets.

Over the first two weeks of August, Sentinel's troubles hit fever pitch. Insiders at Sentinel tried to "juggle" growing redemption demands from customers. Ultimately, on August 13, 2007, Sentinel issued a letter to customers indicating that redemptions were suspended. By August 17, 2007, they would file for Chapter 11 bankruptcy protection.

The Trustee claims that as of August 13th, the total amount that was even "arguably" available to SEG 1 customers was $310,063,120.08. In fact, says the Trustee, substantially more than that sum would later be doled out to those customers, to the detriment of other customers. On August 15, Sentinel redeemed the customer accounts of Alaron Trading, Iowa Grain, Crossland and Trade Maven (Defendants in related actions to this case) to the tune of $111,229,456.41 (roughly $90 million of which allegedly came from funds taken out of SEG 3 accounts the day before). On August 17, Sentinel distributed to SEG 1 customers another $22,524,942.18 in funds, all of which came from the SEG 3 draws. Later that same day, Sentinel filed the Chapter 11 petition.

Having sought bankruptcy protection, Sentinel became deptor-in-possession of its assets. Sentinel's bankruptcy counsel then sought to further distribute approximately $312 million in funds it erroneously thought all belonged to SEG 1 customers. This pool of money constituted the proceeds of a sale of the SEG 1 portfolio from Sentinel to Citadel Equity Fund, Ltd. and Citadel L.P. On the basis of Sentinel's counsel's representations, the bankruptcy judge allowed the distribution. Thus, on August 21, 2007, an additional $297,050,808.26 was distributed to or for the benefit of SEG 1 customers.

The end result of all this was that, in the eight-day span from August 13 to August 21, 2007, SEG 1 customers received $430,805,206.84 in distributions, which the Trustee claims far exceeds any arguable claim. FC Stone, Defendant here, received $15,576,965 of those supposedly excessive funds on or about August 21, 2007.

*The Liquidation Plan and FC Stone's Claim*

Over a year later, on December 15, 2008, the Bankruptcy Court entered an order confirming the Fourth Amended Chapter 11 Liquidation Plan (the "Plan"). Section 4.4 of the Plan states as follows:

> Class 3 consists of all Claims arising from Customer deposits with Sentinel (the "Customer Claims"). For purposes of calculating Adjusted Percentage Recoveries and Percentage Recoveries, and for

purposes of making Initial Distributions and establishing reserves, each Class 3 Customer Claim shall equal the amount listed as "Net Equity" on such Holder's Customer Account Statements dated August 13, 2007 (or if no such Account Statements were issued, the amount that would have been listed), plus any additional amounts such Holder deposited with Sentinel during the period subsequent to August 13, 2007, through and including the Petition Date, minus any additional amounts such Holder received from Sentinel during the period subsequent to August 13, 2007 through and including the Petition Date.

The following section, Section 4.5, states in relevant part that:

> [A]ny payments or distributions made on account of a Class 3 Customer Claim following the Petition Date, including the Citadel Sale Distributions, shall be treated and applied as distributions on account of such Class 3 Customer Claim.

Finally, the term "Citadel Sale Distributions" is defined in the "Definition and Construction of Terms" section as follows: "the post-Petition Date distributions to certain Customers from the proceeds of the Citadel Sale made on or about August 21, 2007."

FC Stone later filed a claim under the plan and, in an order entered on the Bankruptcy docket on August 3, 2010, the parties stipulated to the amount of the claim (the "Stipulation"). The relevant parts of the Stipulation are as follows:

> 1. Subject to paragraphs 2-4 below, for purposes of further distributions under the Plan, the Claim shall be fixed in the amount of $20,834,149.56, which was calculated using the Net Equity Methodology, namely the "Net Equity" reflected on FC Stone's August 13, 2007 customer account statement(s) prepared by Sentinel . . . plus any deposits credited to FC Stone's account(s) through and including the Petition Date, less any subsequent withdrawals debited from FC Stone's account(s) through and including the Petition Date.
> . . . .
> 5. This Stipulation has no effect on and does not resolve the Preference Action, and shall not be admissible in or constitute evidence in the Preference Action . . .

### *The Motion to Dismiss Count V of the SAC*

Defendant argues that Count V of the SAC in this adversary proceeding is an invalid collateral attack on the Plan and the Stipulation and therefore moves to have that Count dismissed.

### DISCUSSION

The doctrine of res judicata "bars relitigation of claims that were or could have been asserted in an earlier proceeding." D & K Props. Crystal Lake v. Mutual Life Ins. Co. of New York, 112 F.3d 257, 259 (7th Cir. 1997). Res judicata bars a claim when it shares the following elements with an earlier action: (1) an identity of the parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits. *See id.*

The Trustee does not (indeed, could not) dispute this longstanding doctrine. Similarly uncontroversial is Defendant's statement that "a chapter 11 bankruptcy plan has the effect of a final and binding judgment, and that any actions taken in contravention of the terms of a confirmed plan are barred by res judicata." *See, e.g.*, *In re Heritage Hotel P'ship I*, 160 B.R. 374, 377 (B.A.P. 9th Cir. 1993) ("Like final judgments, confirmed plans of reorganization are binding on all parties, and issues that could have been

raised pertaining to such plans are barred by res judicata."). What the trustee argues is simply that Count V does not contravene the liquidation plan.

The Trustee's argument wins out. Count V, titled "Reduction or Disallowance of Claims," says, in effect, that if the Trustee loses this lawsuit that any judgment should be reduced by the amount the Trustee claims was distributed to FC Stone on or about August 21, 2007 in connection with the sale of the SEG 1 portfolio to Citadel. FC Stone says that including the August 21, 2007 distribution would run counter to the Plan and the Stipulation because those two orders fixed the time period for counting distributions as between August 13, 2007 and the petition date, or August 17, 2007. Therefore, says FC Stone, the August 21, 2007 distribution lies outside of the timeframe in which claims were to be calculated. The upshot would be that the attempt in the SAC to count the August 21, 2007 distribution would constitute an improper attack on the order and stipulation.

FC Stone's interpretation relies on the language of Section 4.4, which language was mirrored in the stipulation. It is true that Section 4.4 appears to limit the calculation to the period between August 13th and August 17th. However, FC Stone's interpretation ignores Section 4.5, which states that "[A]ny payments or distributions made on account of a Class 3 Customer Claim following the Petition Date, including the Citadel Sale Distributions, shall be treated and applied as distributions on account of such Class 3 Customer Claim." There is no doubt that the August 21, 2007 distribution is fairly counted under this provision of the Plan.

That leaves the Stipulation, which on its face appears to fix the claim at the $20 million figure arrived at using the Net Equity Methodology language and the date span of August 13th to August 21st. There are at least two major problems with FC Stone's reference to the Stipulation. First, the Stipulation expressly aims to fix FC Stone's claim "in an amount consistent with the terms of the Plan." The terms of the Plan, as explained above, permit inclusion of the August 21, 2007 distribution. But more problematic is that a provision of the Stipulation itself states that the Stipulation is to "have no effect on" nor "be admissible or constitute evidence" in this lawsuit. The Stipulation is not helpful to Defendant.

**CONCLUSION**

Because Count V does not contravene the terms of the Plan or the Stipulation, res judicata is no bar to that count. The motion to dismiss Count V of the Second Amended Complaint in *Grede v. FC Stone, LLC*, 09-cv-136 docket entry [102] is DENIED.

For the same reasons, the motions to dismiss the analogous counts in the related cases are DENIED. Specifically, the pending motions at docket entries [31] in 09-cv-101, [32] in 09-cv-115, [34] in 09-cv-120, [37] in 09-cv-127, [31] in 09-cv-128, [35] 09-cv-130, [33] in 09-cv-134, [37] 09-cv-135, [47] in 09-cv-137, [49] in 09-cv-138, and [32] in 09-cv-140, and [32] in 10-cv-3343 are all DENIED.

[1]

---

[1] Substantively identical motions have been filed in related cases. The resolution of those motions is addressed in the Conclusion section.