# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FREDERICK J. GREDE, not individually but as Liquidation Trustee of the Sentinel Liquidation Trust,<br><br>Plaintiff,<br><br>v.<br><br>FC STONE, LLC,<br><br>Defendant. | No. 09 C 136<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

The instant adversary proceeding was chosen as a "test case" to resolve common legal issues among the Trustee's actions in the bankruptcy proceedings of Sentinel Management Group, Inc. ("Sentinel"). In this five-count action, the Trustee seeks to avoid or reduce the transfer of approximately $15.6 million to Defendant FC Stone, LLC ("FC Stone") by alleging: 1) avoidance and recovery of post-petition transfers (11 U.S.C. §§ 549(a) and 550); 2) avoidance and recovery of preferential transfers (11 U.S.C. §§ 547(b) and 550); 3) declaratory judgment that cash and securities held by Sentinel in allegedly segregated bank accounts is property of the Debtor's estate; 4) unjust enrichment; and 5) disallowance or reduction of claims (11 U.S.C. § 502(d)).

After I held a bench trial in October 2012, I entered judgment in favor of the Trustee on Counts I, II, III, and V, and in favor of Defendant on Count IV on January 4, 2013. *See Grede v. FC Stone, LLC*, 485 B.R. 854 (N.D.Ill. 2013). On appeal, the Seventh Circuit reversed my judgment in the Trustee's favor on Counts I and II, reaffirmed my judgment on Count IV in FC Stone's favor, and remanded the case "for further proceedings consistent with this opinion." *See*

1

*Grede v. FC Stone, LLC*, 746 F.3d 244, 254, 258-60 (7th Cir. 2014).

## BACKGROUND

I incorporate the facts from my earlier opinion, *FC Stone*, 485 B.R. at 859-67, and I assume the reader's familiarity with the facts as set forth therein. I also excerpt and adopt the Seventh Circuit's summary of the facts below:[1]

> Sentinel was an investment management firm that specialized in short-term cash management. Its customers included hedge funds, individuals, financial institutions, and futures commission merchants, known in the business as FCMs. Sentinel promised to invest its customers' cash in safe securities that would nevertheless yield good returns with high liquidity. Under the terms of Sentinel's investment agreement, a customer would deposit cash with Sentinel, which then used the cash to purchase securities that satisfied the requirements of the customer's investment portfolio. Customers did not acquire rights to specific securities under the contract, but rather received a *pro rata* share of the value of the securities in their investment pool. Sentinel prepared daily statements for customers that indicated which securities were in their respective pools and the customers' proportional shares of the securities' value.
>
> Sentinel classified all customers into segments depending on the type of customer and the regulations that applied to that customer. Sentinel then divided each segment into groups based on the type of investment portfolio each customer had selected. In all, Sentinel had three segments divided into eleven groups. For our purposes, we focus on two segments: Segment 1, which consisted of FCMs' customers' funds, and Segment 3, which contained funds belonging to hedge funds, other public and private funds, individual investors, and FCMs investing their own "house" funds. FC Stone's funds were in Segment 1.
>
> Both Segment 1 and Segment 3 accounts were subject to federal regulations requiring Sentinel to hold its customers' funds in segregation, meaning separate from the funds of other customers and Sentinel's own assets. Customer funds could not be used, for example, as collateral for Sentinel's own borrowing. The FCMs in Segment 1 were protected by the Commodity Exchange Act and related CFTC regulations, while Segment 3 customers were protected by the Investment Advisors Act and related SEC

---

[1] I have removed the Seventh Circuit's footnotes to eliminate any confusion with my own citations and observations.

regulations. Both sets of regulations created statutory trusts requiring Sentinel to hold customers' property in trust and to treat it as belonging to those customers rather than to Sentinel. See 7 U.S.C. § 6d(a)-(b) (statutory trust under the CEA); 17 C.F.R. § 275.206 (statutory trust under the IAA).

Unfortunately for Sentinel's customers, their investment agreements with Sentinel and the federal regulations bore little relation to what Sentinel actually did with their money. Rather than investing each segment's cash in securities for the segment, Sentinel lumped all available cash together without regard to its source and used it to purchase a wide array of securities, including many risky securities that did not comply with customers' investment portfolio guidelines. Risky securities were used in "repo" transactions or assigned to a house securities pool. At the end of each day, Sentinel would assign securities to groups from its general pool of securities and would issue misleading customer statements listing the securities that were supposedly held in the customer's group account. Sentinel's "house" securities bought in part with customers' money did not appear on customer statements.

Sentinel also allocated a misleading sort of "interest income" to its customers on a daily basis. Under the terms of their agreements with Sentinel, customers were entitled to a *pro rata* share of the interest accrued by securities in their respective pools. However, Sentinel instead would calculate the interest earned by *all* securities, including those belonging to other Segments and the house pool. Sentinel would then guesstimate the yield its customers expected to receive on their group's securities portfolio, add a little extra so that the rate of return seemed highly competitive, and report the customer's *pro rata* share of that amount, minus fees, on the customer's statement.

Sentinel funded its securities purchases using not only the customer cash in the segment accounts but also cash from repo transactions and money loaned to it by the Bank of New York (BONY), the bank where Sentinel housed the majority of its client accounts. BONY required Sentinel to move securities into a lienable account to serve as collateral for the loan. If Sentinel were to move Segment 1 or Segment 3 customer assets into a lienable account, meaning that BONY had a lien on those customer assets to secure its loans to Sentinel, then Sentinel would be violating the trust requirements of federal laws meant to protect Segment 1 and Segment 3 customers from precisely such a risk.

Originally, the BONY loan was meant to provide overnight liquidity. As Sentinel expanded its leveraged trading operations, though, it used the BONY loan to cover the fees those trades required. Sentinel's BONY loan ballooned, growing from around $55 million in 2004 to an average of $369 million in the summer of 2007. As the loan grew, Sentinel began using securities that were assigned to customers as collateral for its own borrowing, moving them out of their segregated accounts and into the lienable account overnight. This meant that securities that were supposed to be held in trust for customers were instead being used for Sentinel's financial gain and were subject to attachment by BONY, a flagrant violation of both SEC and CFTC requirements.

Sentinel's illegal behavior left customer accounts in both Segment 1 and Segment 3 chronically underfunded, but customers were none the wiser. The securities that were serving as collateral for the BONY loan continued to appear on customer statements as if they were being held in segregated accounts for their benefit even though Sentinel was routinely removing them from those accounts.

The music came to a crashing halt in the summer of 2007 as the subprime mortgage industry collapsed and credit markets tightened. Many of Sentinel's repo counter-parties began returning the high-risk, illiquid physical securities that Sentinel had loaned to them. They demanded cash in exchange. Sentinel did not have the cash on hand to pay them and was unable to sell the returned securities. It was also unable to sell its own similar house securities to raise cash. So Sentinel borrowed even more from BONY, putting at risk even more of the supposedly segregated customer assets.

BONY soon notified Sentinel that it would no longer accept physical securities as collateral. It began pressuring Sentinel to pay down its gigantic loan balance. In response, Sentinel moved $166 million worth of still-valuable corporate securities out of Segment 1, where they were held in trust, to a lienable account as collateral for the BONY loan, again violating federal segregation requirements and exposing Segment 1 customer assets to the risk of attachment by BONY. Sentinel also sold a large number of Segment 1 and Segment 3 securities to pay down the loan, again treating customer securities as if they belonged to Sentinel itself and using them for its own financial gain. On August 16, 2007, BONY asked Sentinel to repay its loan in full immediately. The following day, BONY told Sentinel that due to the failure to repay the loan, it would begin liquidating the loan's collateral in a few days. Sentinel filed for bankruptcy protection that same day.

Sentinel took several actions as it approached bankruptcy that dramatically improved the situation of the Segment 1 customers and worsened that of the Segment 3 customers. On July 30 and 31, 2007, Sentinel returned $264 million worth of securities to Segment 1 from a lienable account where they had been placed in violation of segregation requirements. Sentinel then moved $290 million worth of securities from the Segment 3 trust into the same lienable account. This virtually emptied the Segment 3 trust and once again violated federal securities laws. Then, even after informing its customers on August 13 that it would no longer honor requests for redemption, Sentinel nevertheless paid out full and partial redemptions to some Segment 1 customers. Sentinel also distributed cash to two Segment 1 groups that constituted the full value of those accounts. Finally, on Friday, August 17, mere hours before filing for bankruptcy, Sentinel distributed $22.5 million in cash to two additional Segment 1 groups, one of which included FC Stone. FC Stone received $1.1 million in that distribution, which is the pre-petition transfer at issue in these appeals.

After filing for bankruptcy protection, Sentinel again acted to protect the Segment 1 customers at the expense of its other customers and creditors. On Thursday, August 16, Sentinel had sold a portfolio of Segment 1 securities to a company called Citadel and deposited the proceeds of more than $300 million in a Segment 1 cash account. Sentinel filed for bankruptcy the next day, on Friday, August 17.

On Monday, August 20, while still controlled by insiders, Sentinel filed an emergency motion with the bankruptcy court seeking an order allowing BONY to distribute the Citadel sale proceeds to the Segment 1 customers. The SEC, CFTC, and at least one Segment 3 customer appeared at an emergency bankruptcy court hearing. They expressed concerns that Sentinel might have been commingling funds and securities (which was in fact the case), and that there was reason to suspect that Segment 3 securities had been sold to Citadel. After hearing from all who were present (including Sentinel, Citadel, BONY, and some Segment 1 customers), the bankruptcy court issued an order on August 20, 2007 allowing BONY to release the funds. BONY did so on August 21. FC Stone received nearly $14.5 million in that distribution, which is the post-petition transfer at issue here.

The bankruptcy court later appointed Frederick Grede as trustee of the Sentinel bankruptcy estate. The trustee filed adversary

5

> proceedings in the bankruptcy court seeking to avoid Sentinel's
> pre- and post-petition transfers to FC Stone and others. The district
> court withdrew the reference to the bankruptcy court because it
> found the proceedings raised significant and unresolved issues of
> non-bankruptcy law. *Grede v. Fortis Clearing Americas LLC*, No.
> 09–C–138, 2009 WL 3518159, at *3–4 (N.D.Ill. Oct. 28, 2009).

*FC Stone*, 746 F.3d at 247-50.

## DISCUSSION

In light of the Seventh Circuit's decision, the Trustee acknowledges that the Court should enter judgment in FC Stone's favor on Count II (preferential transfer) and Count IV (unjust enrichment). Counts I, III, and V remain in dispute.

**I.     Count I: Avoidance and Recovery of Post-Petition Transfers**

In Count I, the Trustee sues FC Stone under 11 U.S.C. § 549 to recover $14,479,039 that Sentinel paid to FC Stone on August 21, 2007 (the "Post-Petition Transfer"), just four days after Sentinel filed for bankruptcy. To prevail on a § 549 claim, the Trustee must prove that (1) the funds FC Stone received were property of the bankruptcy estate and (2) the Bankruptcy Court did not authorize the Post-Petition Transfer. 11 U.S.C. § 549(a). In my original decision, I found that the Trustee had successfully proven both of these elements.

On appeal, the Seventh Circuit did not make any formal ruling with respect to my decision that the funds Sentinel paid to FC Stone on August 21, 2007 were property of Sentinel's bankruptcy estate, but instead reversed my judgment with respect to the second element, holding that the Bankruptcy Court's August 20, 2007 Order authorized Sentinel's post-petition transfer to FC Stone. *Grede*, 746 F.3d at 254-58. The Seventh Circuit could not have made its holding any more clear:

> The post-petition transfer of $300 million [which includes the
> amounts transferred to all SEG 1 Defendants] was authorized by
> the Bankruptcy Court. That authorization means that the Post-

6

> Petition Transfer cannot be avoided under the express terms of 11
> U.S.C. § 549.

*FC Stone*, 746 F.3d at 247. For good measure, the Seventh Circuit reiterated its holding eight pages later, explaining, "we conclude that the post-petition transfer was clearly authorized by the Bankruptcy Court." *Id.* at 255. And if that were not enough, the Seventh Circuit re-emphasized its holding yet again just three pages after that, stating "we conclude then, that the Bankruptcy Court authorized the post-petition transfer within the meaning of 11 U.S.C. § 549." *Id*. at 258.

Regardless, the Trustee now argues that the Bankruptcy Court did not authorize the Post-Petition Transfer because the Bankruptcy Court "clarified" its judgment authorizing the Post-Petition Transfer one year later in an October 28, 2008 Order, and this subsequent order is entitled to collateral estoppel effect.

The problem with the Trustee's argument, however, is that the Seventh Circuit already considered the Bankruptcy Court's October 28, 2008 Order and held that it was an abuse of discretion, stripping it of any force and effect.

> We conclude that the post-petition transfer was clearly authorized
> by the bankruptcy court. That Court's later "clarification" of its
> order ran contrary to the plain language of its order. We also are
> not persuaded that the Bankruptcy Court order actually authorizing
> the transfer somehow managed not to authorize the transfer within
> the meaning of 11 U.S.C. § 549. It was an abuse of discretion for
> the Bankruptcy Court to have reached that conclusion as part of its
> clarification.

*FC Stone*, 746 F.3d at 255.

The Trustee's collateral estoppel argument depends on the assumption that the October 28, 2008 Order is a viable and valid order. Yet, the Seventh Circuit, in great detail, already held that this order was a legal nullity and an abuse of discretion. Because the Bankruptcy Court authorized it, therefore, the Post-Petition Transfer cannot be avoided under 11 U.S.C. § 549, and

7

I am entering judgment on Count I in favor of FC Stone.

**II.		Count III: Declaratory Judgment**

I previously entered judgment in favor of the Trustee and against FC Stone on Count III, concluding that the funds Sentinel was holding in the SEG 1 account on the day it filed for bankruptcy were property of the estate. 485 B.R. at 890. My previous decision on Count III was not overruled, and FC Stone's arguments for changing it now are unconvincing. I am therefore once again entering judgment on Count III in favor of the Trustee and concluding that the funds Sentinel was holding in the SEG 1 account, including certain reserve funds which are described below, are property of the estate.

The Seventh Circuit did not formally rule on Count III because it reversed my decisions on Counts I and II on other grounds and reasoned that, as a result of these other rulings, a decision on Count III had no bearing on the case:

> The property-of-the-estate question is also academic in this case because Sentinel's approved bankruptcy plan treats all customers as part of a single class of unsecured creditors, and the time to appeal it has passed. That means that FC Stone and the other Segment 1 and Segment 3 customers will be treated as unsecured creditors whether they can establish trusts or not.

*FC Stone*, 746 F.3d at 258. However, this is only 99% correct. Although the property-of-the-estate question no longer plays an active role in Counts I and II, it is not purely academic because the Plan created certain reserve funds whose allocation depends, at least in part, on a determination of whether the funds are considered property of the estate.

Specifically, the Plan describes three "Reserves" designed to hold putative trust funds that are disputed in the Adversary Proceedings brought by the Trustee—including these proceedings. Plan Section 7.20(a) states:

8

(i) *SEG 1 Property Of The Estate Reserve*. On the Effective Date, the Liquidation Trustee shall establish a reserve equal to the amount of all funds held in any bank account denominates as a SEG 1 account, multiplied by a fraction, the numerator of which is the amount of Citadel Beneficiary Class 3 Customer Claims attributable to SEG 1 accounts (the principal amount of such claims calculated consistent with Section 4.4 of this Plan) which voted against the Plan and/or lodged objections thereto, and the denominator of which is the total aggregate amount of Class 3 Customer Claims attributable to SEG 1 accounts.

(ii) *SEG 2 Property Of The Estate Reserve*. On the Effective Date, the Liquidation Trustee shall establish a reserve equal to the amount of all funds held in any bank account denominated as a SEG 2 accounts, multiplied by a fraction, the numerator of which is the amount of Citadel Beneficiary Class 3 Customer Claims attributable to SEG 3 accounts (the principal amount of such claims calculated consistent with Section 4.4 of this Plan) which voted against the Plan and/or lodged objections thereto, and the denominator of which is the total aggregate amount of Class 3 Customer Claims attributable to SEG 2 accounts.

(iii) *SEG 3/4 Property Of The Estate Reserve*. With respect to each distribution that is made to Holders of Class 3 Claims, the Liquidation Trustee shall hold back and create a reserve equal to the distribution that Holders of Citadel Beneficiary Class 3 Customer Claims attributable to SEG 3 or SEG 4 accounts (the principal amount of such claims calculated consistent with Section 4.4 of this Plan) which voted against the Plan and/or lodged objections thereto, would have received had the portion of its Class 3 Customer Claims attributable to a SEG 3 or SEG 4 account been Allowed and received a distribution.

In addition, Section 7.20(b) of the Plan provides that when the Trustee makes a distribution of assets other than "Customer Property" (*e.g.*, litigation recoveries) to SEG 3 customers or other unsecured creditors, the Trustee must reserve for the amount that any SEG 1 customer would be entitled to receive as a claimant pending a determination of whether the August 21, 2007 distributions were transfers of property of Sentinel's estate. As of September 30, 2014, the Trustee has reserved $3,684,606 in this "Section 7.20(b) Reserve."

The Plan expressly provides for what happens if property in the Reserves is found to be

property of the estate. Section 7.20(c)(ii) of the Plan provides:

> In the event the Court determines that the Citadel Sale Distributions were distributions of property of the estate, the Claims of Citadel-Beneficiary Customers shall be entitled to the treatment and distributions set forth in Sections 4.4 and 4.5 of the Plan, without modification.

If I determine that the Reserves are property of the estate, therefore, the Plan mandates that customers and unsecured creditors share pro rata in distributions of property of the estate (including the Reserves) and the SEG 1 customers cannot receive any distributions until everyone else receives an equal recovery, *i.e.*, approximately 70% of their claims. Plan §§ 4.4, 4.5 and 7.20(c)(ii).

In its most persuasive arguments, FC Stone focuses on the commingling that occurred between the SEG 1 and SEG 3 customer accounts. With regards to the Reserves specifically, FC Stone argues that the SEG 3 customers approved the Plan and therefore waived their trust claims under the Plan while FC Stone voted against the Plan and therefore preserved its trust claim. Under this reasoning, FC Stone argues that the dispute over the Reserves is a battle between a statutory trust claimant and a pool of unsecured creditors, and FC Stone's trust claim should be given priority even if FC Stone cannot trace its assets.

FC Stone's reasoning would be more persuasive if Sentinel had not engaged in so much commingling, if its commingling had been limited to the SEG 1 and SEG 3 accounts, and if its claim did not preclude another equally valid statutory trust claimant from receiving any of the funds.

The amount of commingling that occurred in this case—combined with Sentinel's complete failure to keep reliable accounting records—makes Sentinel's bankruptcy unlike any other. Although the commingling that occurred between the SEG 1 and SEG 3 accounts may

have been the most egregious commingling in this case, Sentinel also commingled other funds with the SEG 1 account when it used SEG 1 securities in an unauthorized repo transaction.

Repo markets serve as the pawnshops of the financial world. Repurchase, or "repo," agreements resemble loans in many ways, but a repo transaction is different than a loan. In a repo transaction, a borrower—here, Sentinel—actually sells its assets to a lender with the agreement that the borrower can buy back the assets at an agreed-upon price at some point in the future, which is also agreed upon beforehand. The money that changes hands is effectively a loan, and the assets that are "repo-ed" essentially serve as the collateral for the loan.

A repo transaction is different than a secured transaction, however, because the effective lender of the money—here, BONY—actually owns the assets during the transaction. Unlike the type of assets that could be pawned through a pawnshop, the assets involved in a repo transaction—and this isn't always true, but it is here—can actually produce cash in the form of daily interest accretions. As these assets accrete interest, the owner of the assets at the time of accretion—BONY—receives the benefit.

An understanding of the repo markets is essential to the property-of-the-estate issue because Sentinel's decision to use SEG 1 securities in its repo transactions with BONY and then lie about it on its accounting statements means that Sentinel was not only commingling SEG 1 property with SEG 3 property, but it was also commingling SEG 1 property with other funds that it had in its possession. For obvious reasons, Sentinel did not tell its customers that it was violating both SEC and CFTC requirements by doing this. In an effort to keep its customers ignorant but happy, Sentinel paid out interest to the SEG 1 customers as if Sentinel still owned and possessed the SEG 1 securities. But Sentinel didn't. Rather, Sentinel "guesstimated" the yield SEG 1 customers expected to receive on their securities portfolio and then added a little

extra before paying out these amounts to the SEG 1 customers. Where did this money come from? Not from the securities themselves, because BONY received any interest that the securities earned until Sentinel repurchased them. The money that was paid to SEG 1 customers as "guesstimated" interest payments, therefore, came from Sentinel's own funds and the funds of its other customers.

I previously cited *Cunningham v. Brown*, 265 U.S. 1 (1924) for the proposition that common law tracing rules in the context of bankruptcy "require a trust beneficiary to identify particular trust property to exempt it from the estate." Although the Seventh Circuit said that it generally agreed with my discussion of and my answer to the problem, it described some concern with my use of *Cunningham* in rendering these trust assets property of Sentinel's estate. As the Seventh Circuit noted, *Cunningham* did not deal with statutory trusts, and this difference is significant:

> Where Congress has acted to establish a trust for certain customers to strengthen their confidence in capital markets, the trust may be more robust than one imposed by the court's equitable powers. The Congressional protection indicates a national interest in protecting these customers.

*FC Stone*, 746 F.3d at 259. The Seventh Circuit then proposed a new rule for competing statutory trust claimants: "require trust claimants to trace without the benefit of tracing conventions, but [] place trust claimants who fail to trace in a class ahead of at least unsecured creditors, giving them priority in bankruptcy proceedings." *Id*.

The Seventh Circuit's proposed rule is a reasonable one, but it is not fully compatible with the facts of this case, which are messy. I cannot apply this rule to the SEG 1 customers and SEG 3 customers here—both of whom agreed to be treated as general unsecured creditors under the Plan—without creating absurd results.

As I discussed in my previous opinion, equity prevents me from favoring one statutory trust claim over another. Tracing is difficult here, if not impossible, because Sentinel's commingling prior to its bankruptcy filing was so appalling, not only between the SEG 1 and SEG 3 accounts but also between the SEG 1 account and Sentinel's other accounts. Even if the SEG 1 customers preserved their rights to assert a trust claim with respect to the Reserves and the SEG 3 customers waived their rights to do so, therefore, equity would not allow me to determine that the funds in the SEG 1 account when Sentinel filed its bankruptcy petition was property of the SEG 1 customers only. Without tracing, such a determination would be unjustifiably unfair to Sentinel's other unsecured creditors and, more importantly, the SEG 3 customers who had an equally valid statutory trust claim.

The dispute raised in Count III is therefore not a dispute between two statutory trust claimants, nor is it a dispute between statutory trust claimants and a pool of unsecured creditors. It is more complicated. After sitting through a bench trial, I can only conclude that the funds held in the SEG 1 account, including the Reserves, are property of the estate and should be distributed according to Sections 4.4, 4.5 and 7.20(c)(ii) of the Plan.

Even if the Reserves were determined not to be property of the estate, however, such a determination would have no effect on their allocation under the Plan. Section 7.20(c)(i) of the Plan provides:

> In the event the Court determines that the property in any of the Property Of The Estate Reserves is not property of the estate, Sections 4.4 and 4.5 of the Plan shall be deemed modified to provide that Customer Property shall be distributed to the rightful owners of such property *or to the Estate*, as determined by the Court.

Under Section 7.20(c)(i) of the Plan, therefore, I have discretion to distribute the Reserves to the estate even if the Reserves are found not to be property of the estate, and I would use my discretion to do exactly that for the reasons discussed in this opinion and my previous one.

13

I am therefore entering Count III in favor of the Trustee. Under the Plan, customers and unsecured creditors alike share pro rata in distributions of property of the estate (including the Reserves), and FC Stone cannot receive any additional distributions until everyone else receives an equal recovery. Plan §§ 4.4, 4.5, and 7.20(c).

### III.     Count V: Disallowance or Reduction of Claims

Section 502(d) of the Bankruptcy Code provides for the disallowance of the claims of an entity that receives an avoidable transfer from the debtor's estate and does not return such transfer to the estate. *See* 11 U.S.C. § 502(d). Because the Seventh Circuit already held that FC Stone did not receive any avoidable transfers from Sentinel's estate, I am entering judgment on Count V in favor of FC Stone.

### CONCLUSION

In light of the Seventh Circuit's decision, I am entering judgment in FC Stone's favor on Counts I, II, IV, and V, and I am entering judgment in the Trustee's favor on Count III.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: March 28, 2016